[J-78-2020] [MO: Donohue, J.]

**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| PENNSYLVANIA ENVIRONMENTAL DEFENSE FOUNDATION, | : | No. 64 MAP 2019 |
| | : | |
| | : | Appeal from the Order of the |
| Appellant | : | Commonwealth Court dated July 29, |
| | : | 2019 at No. 228 MD 2012. |
| | : | |
| v. | : | ARGUED: September 17, 2020 |
| | : | |
| | : | |
| COMMONWEALTH OF PENNSYLVANIA, | : | |
| AND GOVERNOR OF PENNSYLVANIA, | : | |
| TOM WOLF, IN HIS OFFICIAL CAPACITY | : | |
| AS GOVERNOR, | : | |
| | : | |
| Appellees | : | |

**DISSENTING OPINION**

**CHIEF JUSTICE BAER**                                        **DECIDED: July 21, 2021**

As in my responsive opinion in the initial appeal of this case, I commend this Court's holdings in *Pennsylvania Environmental Defense Foundation v. Commonwealth*, 161 A.3d 911 (Pa. 2017) ("*PEDF II*"), which continued the rejuvenation of the Environmental Rights Amendment of the Pennsylvania Constitution, Article I, Section 27 ("ERA"), begun by Chief Justice Castille in his plurality in *Robinson Township, Washington County v. Commonwealth*, 83 A.3d 901 (Pa. 2013). In so doing and as described in the current majority opinion, the Court properly rejected the view that the ERA was an "aspirational policy statement" and instead deemed it self-executing. Majority Opinion at 8 ("Maj. Op."); *PEDF II*, 161 A.3d at 937. Moreover, the Court rightly discarded the test adopted in *Payne v. Kassab*, 312 A.2d 86 (Pa. Cmwlth. 1973), that had been applied for more than four decades and instead returned to the language of Section

27, correctly opining that it created what the current majority opinion phrases as a "constitutional public trust." Maj. Op. at 2.

Respectfully, however, I remain in dissent regarding my colleagues' conclusion that Section 27 should be subject to private trust principles, including those specifically related to the distribution of income generated by trust assets. In my view, Section 27 does not equate to a standard private trust instrument, which generally consists of a multi-page document detailing trust assets, beneficiary classes and distributions, and trustee powers and duties. Instead, the public trust created by the ERA arises from the following sparse, two-sentence constitutional provision:

> Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

PA CONST. art. 1, § 27.[1]  Rather than providing instructions related to the division of income, the ERA sets forth expansive rights of Pennsylvanians and imposes important, but general, duties on Commonwealth entities, which encompass, as described by the majority, a "cross-generational dimension," requiring the Commonwealth, as trustee, to resist prioritizing "the needs of the living over those yet to be born." Maj. Op. at 36.

I maintain that the ERA's language is more befitting general trust concepts, such as prudence, loyalty, and impartiality, rather than the intricate aspects of private trust law and precedent. See *PEDF II*, 161 A.3d at 942-46 (Baer, J., concurring and dissenting) (attempting to glean public trust principles available at the time of the adoption of Section 27 and finding private trust principles inapt). As I previously stated in *PEDF II*, I view the

---

[1] The ERA begins with the following language which is not directly applicable to the current inquiry regarding the natural resources trust:  "The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment." *Id.*

ERA as creating "a fiduciary-like construct whereby the government has 'the duty to manage, use, and/or consume the property of the public solely for the benefit of the public.'" *Id.* at 943, 944 (quoting Duquesne University Professor Robert Broughton's analysis of the proposed amendment as set forth in 1970 Pa. Legislative Journal–House at 2269–82, 2273 (April 14, 1970)) (Baer, J., concurring and dissenting).

I recognize, however, that a majority of the Court disagreed and instead deemed private trust law applicable. In *PEDF II*, the Court concluded that application of private trust law principles required all royalties derived from the sale of oil and gas on state forest and park lands to be deemed sales of trust assets, which required the proceeds to be returned to the trust corpus to be used exclusively for conservation purposes. It then remanded the case to the Commonwealth Court to apply trust principles applicable at the time of the enactment of the ERA to determine whether the other income streams of bonus payments, rental fees, and interest from late payments generated by the oil and gas leases should be deemed sales of the trust assets and also whether the income streams should be designated part of the corpus of the trust to be used solely for conservation uses.

In my view, the Commonwealth Court on remand engaged in a yeoman's effort to comply with this Court's directive. The court delved into the intricacies of trust law applicable to mineral rights in 1971, when Pennsylvania voters adopted the ERA. Recognizing that trusts involving mineral rights generally utilized the concepts of life tenants and remaindermen, the court attempted to apply those concepts and the related statutory provisions and precedent to Section 27 and the Commonwealth's detailed leases of oil and gas rights. In so doing, it ably weighed the applicability of the open wells

doctrine and the various iterations of the Uniform Principal and Income Act, as adopted in Pennsylvania, involving life tenants and remaindermen.[2]

Nevertheless, the current majority holds that the Commonwealth Court erred in concluding "that the ERA created life estates for the benefit of current Pennsylvania citizens, followed by successive beneficiaries in the form of future generations of Pennsylvanians as the remaindermen." Maj. Op. at 34. Instead, my colleagues reason that the ERA does not create "income entitlements" for life tenants but instead "simultaneous beneficiaries with equal interests in the trust's management."[3] Id. at 37. Absent a division of beneficiary classes between life tenants and remaindermen and provisions for income entitlements to life tenants, the majority concludes that all income generated by the leases "must be returned to the corpus of the trust." Id. at 37. Relying on well-established case law relating to trustee self-dealing, it expounds that absent

---

[2] In his recent article reviewing the Commonwealth Court's decision in this case and the application of charitable and non-charitable trust law to public trusts, Professor John Dernbach, the Commonwealth Professor of Environmental Law and Sustainability at Widener University, Commonwealth Law School, ultimately disagreed with the Commonwealth Court's conclusions but, nevertheless, acknowledged the court's use of the concepts of life tenants and remaindermen. John Dernbach, *The Role of Trust Law Principles in Defining Public Trust Duties for Natural Resources*, 54 U. Mich. J. L. Reform 77 (2020). In so doing, he quoted the following explanation from George T. Bogert's treatise on trusts:

> Nearly all trustees act for two classes of beneficiaries, namely, income beneficiaries who are to receive the net income from the trust property for a period of years or lives, and remainder beneficiaries who at the termination of the income administration are given the capital or principal of the trust.

*Id.* at 133 (quoting George T. Bogert, *Trusts* § 111 (6th ed. 1987)).

[3] In so analyzing, the majority opinion demonstrates the granular detail provided in many trust documents regarding the distribution of income and the creation of successive beneficiaries. Maj. Op. at 39 n.18.

language creating income entitlements for life tenants, "there is no authority for the trustee to generate income from oil and gas assets and then use that income to benefit itself for non-trust purposes and not the beneficiaries." Maj. Op. at 40-41. Accordingly, it opines that any income must be devoted solely to the trust's purpose, which is to "conserve and maintain" Pennsylvania's natural resources.

Without addressing the merits of the majority's application of this terminology, I question whether Pennsylvania voters, as "settlors" of the trust, contemplated the concepts of "successive" or "simultaneous" beneficiaries or "income entitlements," when the language adopted does not even mention the more basic trust terminology of beneficiaries and trust corpus. *See PEDF II*, 161 A.3d at 942 (Baer, J., concurring and dissenting). More fundamentally, however, I question whether Pennsylvania voters intended for the ERA to address the income generated by the natural resources in the first place.

In its analysis, the majority opines that "[t]he textual absence of an allocation mechanism [for revenue generated] has a straightforward explanation: the settlors did not intend to create any income entitlements, hence eliminating the need to allocate receipts." Maj. Op. at 43-44. In my view, the absence of such language is evidence that the ERA was never intended to apply to income generated by the resources, but instead to instruct the Commonwealth to "conserve and maintain" Pennsylvania's natural resources for "the benefit of all the people." PA CONST. art. 1, § 27. In line with this reasoning, I question the applicability of the concept of trustee self-dealing where the funds are directed to the General Fund. In such a situation, the income generated is simply not being siphoned off by the Commonwealth "for its own use," Maj. Op. at 42, but instead is being employed to

benefit all Pennsylvanians by providing basic governmental services underwritten through the General Fund, including, for example, roads, schools, and health services.[4]

While I acknowledge that a majority of my colleagues rejected my analysis when this case was last before the Court, I believe that the arguments addressed in this case following remand demonstrate the unsoundness of forcing the public trust created by the ERA into the ill-fitting structure of private trust law. In my view, the application of private trust law to the ERA has resulted in contrived distinctions that are not reflected in the language of the constitutional provision. Going forward, the practitioners, agencies, and judges of our Commonwealth will find themselves in the unenviable position of divining which bits and pieces of the wide-ranging and well-developed body of law governing charitable or non-charitable private trusts should apply to the scant language of the ERA. Indeed, the majority opinion alludes to this difficulty, observing that while Section 27 created an "express trust that is presumptively subject to the Uniform Trust Act, the ultimate power and authority to interpret the constitutional command regarding the purposes and obligations of the public trust created by Section 27 rests with the Judiciary, and in particular with this Court." Maj. Op. at 34-35 n.15 (quoting *Robinson Township*, 83 A.3d at 959 n.45).

As referenced in note 2, Professor John Dernbach recently wrote a thoughtful article attempting to remedy this conundrum by setting forth a four-step process for determining which charitable and non-charitable private trust law principles to apply to a

---

[4] In support of the conclusion that the income streams from oil and gas leases should be returned to the trust corpus, the majority observes that at the time of enactment of the ERA the voters may have understood that the Oil and Gas Lease Fund Act provided for all rents and royalties to be "exclusively used for conservation, recreation, dams or flood control." Maj. Op. at 42 (quoting former 71 P.S. § 1331, repealed by Act 2017, Oct. 30 P.L. 725). The voters, however, were presumably also aware that this restriction was not included in the ERA and were cognizant that statutory law could be relatively easily altered in the future to address the changing needs of the people and the Commonwealth.

specific public trust application, utilizing the facts of the present dispute as a case study. John Dernbach, *The Role of Trust Law Principles in Defining Public Trust Duties for Natural Resources*, 54 U. Mich. J. L. Reform 77 (2020).[5] This process requires the gathering and assessment of potentially applicable principles of charitable and non-charitable trusts as well as general trust duties. With all due respect, I question whether agencies and practitioners working with Pennsylvania's natural resources should be forced to become experts in charitable and non-charitable private trust law and then predict which trust law provisions this Court will eventually deem most applicable to a specific scenario.

I urge my colleagues at this early stage in the development of ERA to reconsider the application of private trust principles to the language of Section 27. As explained, I question the relevance of intricately detailed private trust principles to the broad language of the public trust created by the ERA. While I agree with the majority that "the settlors did not intend to create any income entitlements," Maj. Op. at 44, as previously explained, I would go further and conclude that the settlors did not intend for the ERA to govern

---

[5] Briefly, Professor Dernbach outlines the following "four-step methodology for determining application of trust law principles to natural resources public trusts:"

> Step 1: What are the terms and purpose of the public trust?
>
> Step 2: Do the terms and purpose of the public trust answer the question?
>
> Step 3: If the terms and purpose of the public trust do not answer the question, what underlying principles of trust law can help provide an answer?
>
> Step 4: Which principles would most fully effectuate the terms and purpose of the public trust?

*Id.* at 124-44.

income generated by the natural resources, but rather merely directed the Commonwealth, as trustee, to conserve and maintain those resources. Having witnessed the difficulties arising from the attempted application of private trust principles in this case, we have the opportunity at this juncture to change course and develop public trust principles in Pennsylvania rather than continuing to force private trust principles onto the ERA.